United States v. Collins, 25-7017. Good morning. Peron Taranjo on behalf of the appellant, John Collins. In his appeal, Mr. Collins raises- Can you move the microphone up so it's right in front of your- Yeah, is that better? That's better. Okay. In his appeal, Mr. Collins raises five claims of error, one of which the government agrees warrants vacature of his sentence and remand for resentencing, specifically that the district court erred in failing to consider whether Mr. Collins' federal sentence should run concurrently to his then-anticipated state sentences for the same conduct on charge- Excuse me. I plan to address the remaining arguments in the order they appear in the briefs, but I welcome questions on any of our claims. At trial, the government proved that Mr. Collins seriously abused and neglected his stepsons. What it did not prove was that at the specific moment that he hit J.M. in the head with a pipe, Mr. Collins intended to kill him. The government had to prove that at the moment of the pipe strike, Mr. Collins specifically intended to kill J.M. Specific intent to kill means a conscious desire to cause death. It's not the same as expected harm or recklessness with result to harm. Okay. So I know you're going to disagree with me because of my choice of weapon here, but you would agree that if it was a gun and I pointed it at you, and whether I actually meant to or not and pulled the trigger and killed you, that my intent to kill could be presumed? Yes, I think so. Okay. And I did the most dangerous thing I can do. I got on Westlaw myself and did a little bit of research in state court databases and found a lot of cases. I'm not going to represent my search as exhaustive, but cases with bats, pipes, mallets, hammers, where courts had found that striking someone in the head with those things could be, could in and of itself be evidence of an intent to kill. Do you disagree with that? I do. And I think it's because of the bareness of this record. So. Okay. But just as a matter of, you don't disagree that if I walked up to you with a piece of pipe and whacked you in the head with it that, and it was a clear, strong blow that from that we could, we could take it as evidence of intent to kill. I think if you had, yeah, a metal pipe, a heavy one, or something substantial like a bat, you aimed at my head, you swung through, and you, not just with arm strength or, you know, in the course of a scuffle, and you were directly aiming at my head, yes, then I think maybe we could infer specific intent to kill. What if I, what if I took your head and slammed it into the pavement? I, possibly, Your Honor. I think that. Some cases say yes. Yeah, I mean, sure. I think that these, those types of examples though, are not represented in this record at all. The only mention of a pipe in the entire evidentiary portion of the trial was when defense counsel said, J.M., do you remember anything about a pipe? And he said, yeah, my dad just knocked me in the head with it. That is a direct quote. Not metal. Not my dad took it, swung it through with the full force of his body. He was aiming at my head. We're missing all of that. And I don't think those are reasonable inferences from the record. What we do have is that J.M. had no skull fracture, no brain injuries. And if, given that we don't know anything about the nature of the act itself, we kind of have to look at the injuries. And here we have superficial lacerations that, while they were bloody, don't, weren't life-threatening. And if you did swing at a child with that kind of force that would reflect intent to kill, you'd think that you would break their skull or hurt their brain in some way. And we don't have that evidence here. Well, you're charged with attempted murder, right? And I swing a pipe or a baseball bat at your head, and the victim moves at the last second, so gets a bruise. Not life-threatening. But you could still infer that there was an attempted murder there. And, you know, but for the grace of God, the victim avoided a serious blow. Absolutely. Absolutely. But we would need evidence of that in the record, that there was a swing and a miss, or that there was a swing and J.M., you know, put his hands up or moved away. He said, no, my dad, or he said, yes, my dad just knocked me in the head with it. That's all we have. So I agree. If you swung and you missed, and so there's no injury, okay. But we don't have any evidence that he was aiming at the head versus just any body part, grabbed whatever he had, hit it. We just don't know anything. And that's what was the government's burden to prove. And they didn't prove it up here. J.M. was called by the prosecution, correct? Yes. Yes. What was their examination like about on this as to the blow to the head? What did they ask? What did he say? They tried pretty hard to get him to say that his head injuries were caused by a pipe. And he consistently said they were caused when his dad kicked him across nails. They asked him, hey, did your dad hit you with anything else? But his foot, no. He said, no, they didn't. And he didn't remember anything else. And so I think they were expecting him to say that he was hit in the head with a metal pipe. And he never said that. On direct? On direct. But on cross, he did. Not a metal pipe, he said. Defense counsel again asked, do you remember anything about a pipe? And J.M. said, yeah, my dad just knocked me in the head with it. That's not a metal pipe. Well, you're not quibbling, you know, whether it's a PCV pipe or a metal pipe, are you? Oh, yeah. Yes, absolutely. I don't think it's a reasonable inference in this day and age that it's a, you know, a cast iron metal pipe. Pipes can be made out of tons of different materials. There's no indication that it's a metal pipe. OK, was there a redirect examination of J.M. by the prosecution? Your Honor, I think so, but not on this topic. Not on this? You can look through the entire trial. And I have. And this is the only mention of a pipe. OK, and there was no mention of a pipe either in the question to J.M. by the prosecution or the answer by J.M. to the prosecutor's question. Pipe was never mentioned. No, but that was their burden. If they wanted to elicit that information, they needed to elicit it. Well, but it happened in their case in chief when he responded to the Collins's lawyer's question. It's still in the case in chief that he was hit with a pipe. Yes, yeah, yeah. He did say that. And what he didn't use the word hit. What would he say? He said, my dad just knocked me in the head with it. That's that's it for this. This entire trial was the government's burden to prove. This was the nature of the evidence on the beating and the dragging across the floor and the kicking across the floor or whatever happened. Was it all contemporaneous? Was he describing this as happening all at once? The evidence is a little mixed on that. This happened over the course of four days. And the timing is quite unclear to me. If we had to draw an inference in favor of a jury verdict, would we would we say there was sufficient evidence to do that? As as this a lot of this being contemporaneous? Yeah, I think it doesn't matter too much because all of the evidence is all of the injuries and the acts taken are consistent with an intent to punish and hurt, but not an intent to end J.M.'s life. So while cumulatively, I think these injuries were ultimately life threatening. They did all happen over the course of four days. None was the kind of injury that an adult would inflict on a child if he was trying to kill him with that opportunity. Okay. Was there any differentiation in the types of beatings on any of the four days? Day one differed from day four or anything like that? It's not clear to me from the record. It seems like it was they were walking him around the property trying to find this money and were hitting him kind of on all parts of his body across the four days. It seems like the last night things escalated, but that's all I know. In J.M.'s testimony about the pipe, is there anything there that you can infer that that was on the fourth day versus the third day or what? I don't think so. It seems incredibly vague about when it happened beginning or end in this whole sequence. It also didn't seem like the focus, J.M.'s focus of what caused his injuries generally, it really was in passing. So no, I don't think we can know what time it happened. But as to what actually happened in the beatings, the only eyewitnesses were Collins, his wife who had also been charged, J.M., and R.M.? R.M. for some, but not all. Those are the only four eyewitnesses? Yes, as far as I know. And so these other witnesses, the friends that were staying there, they're just, their testimony was only about what they observed as to the injuries? Yes, yeah, yeah. And one of them testified to what he heard, this sort of yelling between J.M., Ms. Collins, and Mr. Collins. But he didn't say, oh, I heard a blow or anything like that. He heard the yelling and the scuffle. I had another evidentiary question, and this was on the victim's Indian status? Yes. And I know we've had some recent case developments in that area. Yes. I just had a question about the record. And is it correct that the mother, Mrs. Collins, testified that she was Indian and that her children were also Indians as part of her testimony? No, I don't think so, unless I misunderstood something in the record. I don't think she directly testified to that. Ms. Smith, who was a DHS representative, said, Ms. Collins told me that her kids were, she was Indian and her two sons were. And did she testify that the children had tribal cards, though? No, she said they were members of the Choctaw Nation, but she didn't say they have tribal cards, we have the CDIB. So, no, that's not my understanding. Why wouldn't that be sufficient evidence to overcome the other, you know, the hearsay problems with the other pieces of evidence? Well, first, the inquiry on prejudice for third prong isn't whether the remaining evidence is sufficient for a jury to convict. It's whether, with taking out the inadmissible evidence, whether it was reasonably likely to affect the verdict. And I think that is pretty clear here. But answering your question directly, I think even though it was admissible hearsay, this is secondhand testimony that's not official from the tribe about recognition. It has the same sort of secondhand problems that are attendant to hearsay. There was a question about Ms. Collins' credibility throughout the trial. But also, it's just not direct confirmation from the tribe, which is why the government typically gets these documents from the tribe. But that goes to wait, right? The things you're saying right now go to wait? I think they go to whether the evidence that was inadmissible really had a substantial effect on the jury's verdict here, and I think it did. I want to ask you a question about this whole thing. First off, on the plain error argument, the two cases that we decided were not decided on plain error, right? Correct. Okay. At the time, this error was not plain or obvious. So that troubles me a little bit. I know you have a response to that. But the other thing that bothers me is the nature of the evidence, this hearsay evidence, when it's not objected to. Because it seems to me the idea that we're going to find plain error in reverse cases based on hearsay is putting the trial judge in a terrible position. Because the trial judge is going to have to sit up there and listen. There's a lot of hearsay. Tons of hearsay comes in in trials. And the judge does not sit there and say, oh, stop counsel. I know there's no objection, but that's hearsay. We're going to strike it from the record. Um, ask another question. It just doesn't happen that way. And we're in a situation here where foundational objections, hearsay objections, best evidence objections, the district court is going to have to decide all of those sua sponte or be reversed. So I want to address, I'm going to run out of time in my answer. May I answer the question? Okay, so on the first question about these errors weren't plain at the time of the trial. This court has said repeatedly and recently said in Ben John that it matters whether the error is plain at the time of appeal, not at trial. So this court has to follow other panels. And I don't think, yeah, so that's the answer to the first question. But as to the second, that's true with a lot of trial errors, right? It's like, like what? Um, I think like, well, I can, I don't know. I can't think of it. Give me some testimonial errors that are like that. I'm sorry, Your Honor, I can't think of the top of my head. That's because it basically doesn't happen. It basically doesn't happen. I mean, you could, you would never with, with the poor questioning that occurs at trial, the strategic decisions to not object to every little thing that's being said. Um, it just, it's, it's, it's your, your request here to me seems impossible for the trial judge because this wouldn't just be limited to this type of error. It would be, it would be any type of prejudicial hearsay error could be reversed on plain error if it was an obvious hearsay problem. I think that's what the plain error standard calls for is if it's clear and obvious. And here, these are pretty well vetted. At, at the time, Hatley and Harper had, had been decided, not decided, but they had been tried. And they got, there were objections made in both of those trials. So the government was aware. One of them was the same office, Hatley. So the government knew it could be taking a risk by admitting this evidence or trying to get this evidence in. I think Indian status is a pretty unique element. And the, the evidence that often is elicited to prove that is pretty unique. So I don't know that there is really a slippery slope problem. But again, I think that's what plain error is, is when it's a plain or obvious error, when many hearsay want, hearsay errors won't be plain or obvious, then this court reverses. It was, it was obviously prejudicial. I, I sit, I'll just tell you, I mean, just from practical experience, I've sat on trials, and I sit up there, and I cringe at the amount of improper questions that are asked and answered without objection. Yeah, I understand. Wouldn't there be an invited error problem here? The fellow, you know, the failure to object was strategic. I, I think there's no evidence in the record that that was, this was a strategic move. There's nothing to gain by it. They built an error. I, I, I think it's highly improbable, given the rigorous burden that one has to prove plain error on appeal, to strategize and hold off on the hope that you convince a panel of three that it's plain prejudicial and affected the public perception of judicial proceedings. So I think it defies reason to think this was a strategic move here on this record. Thank you, counsel. Thanks. Let's hear from the government.  Good morning, your honors. May it please the court. Lisa Williams, representing the United States of America. I think I'll begin where the panel left off, which is with the issue about the tribal status. And the government shares the exact concerns that the panel expressed. If, if the panel, if this court is going to start reversing on plain error, non-constitutional evidentiary areas, errors, right? This isn't even a constitutional error. This is a non-constitutional evidentiary error. It is going to be nearly impossible for trial judges to effectively try the case. Because the judge is now going to become the third attorney in the room. And they are going to be responsible for suesponses. Are you suggesting that there is no case where hearsay comes in, unobjected to, is not subject to the plain error analysis? You're not suggesting that, surely? No, your honor. The government is not suggesting that any time hearsay isn't objected to, a defendant can't raise it on plain error. Why is this case so different then? Well, because the nature of this type of evidence, you know, the fact that the office had dealt with Hartley and Harper was out there, cuts both ways, right? Because defense counsel's also on notice that Indian status is a live issue in the circuit that has to be proven. And this trial counsel, who the judge, magistrate judge commented is exceptional at preserving appellate issues, chose not to raise it. Wait a minute on that. Could that have been a statement by the judge that the judge was in an impossible position and it was just trying to fortify the record? This lawyer is very good. He objects in trying to preserve this verdict, if there is a verdict. I don't think so, your honor. I think, I think that trial counsel was actually just a really good attorney and he was very aggressive and he was very good at objecting and he was very good at preserving the record. And you can read through the trial and see how he's lodging objections. I mean, I think it's an accurate statement. Are you saying that the record suggests that this lawyer purposefully failed to object in order to have the opportunity on appeal to have the issue presented on a plain air standard? I think the record strongly suggests that this lawyer purposely chose not to raise the issue of Indian status as a defense. That that was a strategic decision by trial counsel. I do think the record suggests that. And given that this was a strategic decision by defense counsel. Well, that's, that's, government loves stipulations, your honor. That's a great, that's a great question. But keep in mind that the defense at trial was, I never did this. That was Mr. Collins' defense. He said his wife must have done it or Benjamin Rutledge must have done it. But that, that is how trial counsel structured this trial. Unless an element is stipulated to, the government has the burden to prove each element. And we did with numerous evidence, including evidence that wasn't objected to. And I did want to point out, it wasn't the mother that testified that they had tribal enrollment. It was the defendant. The defendant himself testified that both boys had tribal enrollment cards. So the defendant conceded during trial the existence of their tribal enrollment. Because this is not a trial about Indian status. Right. But don't we judge this from the prosecution's case in chief? That element had not been proved. The initial Rule 29 motion would be. But I believe the law is, at the conclusion of the case, this court reviewing, reviews the sufficiency of the evidence based on the entire trial record. So, again, and that's why this is, it's not every hearsay. But, but this, the way that this is postured before this court. But I don't think it would be, to go back to your original question, Your Honor. I don't think it's an easy hill for a defendant to claim plain error review on a non-constitutional evidentiary issue, period. Do you have authority that says that? It's very difficult. Oh, I think a Frost case, Your Honor, which I know that two of you are very familiar with. Frost lays out all of the concerns about raising, raising plain error. This is what Frost said. Our review is hampered by the incompleteness of the factual record. Hearsay determinations are particularly fact and case specific. Had they timely objected, there'd be a record. But these issues weren't explored in detail. We're left to speculate. And then the court continues where the determinative facts are missing from the record due to the defendant's failure to make a timely objection. We will not find plain error based on the possibility that better factual development would have made the error clear. So I think Frost really does put that. To plainness or to prejudice? Well, the government includes it in the plainness section of our brief, but I think it really speaks to both that you can extrapolate that concept and apply it to both of those prongs of plain error review. I know it didn't happen here, but in these cases, can't the government get the tribal cards of these, certainly the victims here, sometimes the defendant might hide the ball, you know, is there any impediment in this case to getting the tribal cards? So with respect to the Choctaw Nation tribal cards, they are only maintained electronically. That's Ms. Oaks testified to that at trial. So there is no actual paper card. Can I get a screenshot? Well, that's the next step. I mean, so the exhibits that were omitted is what happens when you hit print on the computer to say print it out. And so if the court is unhappy with that format, which the court should not be, right? Like you're pulling the evidence from the machine, from the electronic. Our only concern is that you overcome the hearsay objections. And I think that, you know, if there was an objection, could the method of how the data was electronically stored have been better flushed out? I do think that it could have been better flushed out on the record, and it could have said a screenshot won't work, or this is basically a Skype. But the fact of the matter is the record is missing that because there was no objection raised. But there will be in the future. I mean, so it will be done, correct? You mean objection can be raised or the new way? Because it can be done. Well, I think that certainly Hartley, Harper, I believe that maybe this same issue was just heard at oral argument in New Mexico a couple weeks ago. And in the case today, we are trying to figure, the government is trying to figure out how to properly do this. And it is our sincere goal that we do so without following the rules of the evidence and not violating evidentiary rules. So yes, Your Honor, I would hope that it's doable and that we end this discussion in the near future with this court. But again, it's Hartley and Harper, and the government makes this distinction in their briefing. It wasn't clear in that record that the tribal enrollment records are only maintained electronically in the database. And so part of this is just flushing out what this evidence looks like so that the court can properly analyze whether or not it meets the 8036 requirements. But again, I don't think this court has to do that because we are on plain error review, not abuse of discretion review. I would like to... But you do agree it was error? And you do agree it was plain? I don't agree with either one of those prongs, Your Honor. Or the government doesn't concede the first two prongs of plain error. Because the government's position is that Hartley and Harper do not lay down a per se rule of inadmissibility. They said that the way it was admitted was wrong in those specific cases. And again, key there is that those panels thought that or didn't... They both mentioned that this was not an electronic database. And what we have now, the evidence here is that these tribal enrollment cards are only contained in the electronic database. There is... So that is a distinction with a difference. And given that the letter is just a summary of information contained in electronic database, that sets them apart from Harper and Hartley's concerns. So if we're writing this case on that issue in your favor, and we say that, that means in all cases involving Choctaw tribal membership, the same thing will be done then as was done here. Well, I think there's a couple different factors that go into that, Your Honor. Is it a published opinion? Is it unpublished? It is a published opinion. It's a published opinion. The Choctaw Nation will be the exception. Well, you have to admit that. Well, I mean, if the court decides the issue, it's hard because since it's plain error review, I'm thinking in the future of standing up and arguing it again on abuse of discretion. I don't think I could rely on a plain error review case to show later that the court didn't abuse its discretion. I just think that the fact that we're living in plain error review puts this case off on an island and makes its persuasive future value uncertain at this time, would be my best answer to that. I would like to now turn to the specific intent evidence. One of the evidentiary pieces of evidence that defendant did not address is the testimony of RM, who as the court astutely noted, was the fourth eyewitness to this assault. And what RM testified, well, first of all, RM told Dr. Conway at the hospital that he the defendant bash his brother's head in. Okay, this is in the report of what RM told the provider? This is when Dr. Conway testified as to what RM told him.  And then, so bashed his head in is what RM said at the hospital. And then at trial, RM testified that he saw defendant put a hole in JM's head, which made it bleed a lot. So it's not just JM saying that he knocked him in the head with a pipe. But the forensic evidence didn't indicate there was a hole in the head, did it? Oh, it did, Your Honor. And that was going to be my next point, is that they try to downplay the severity of the injuries to the head, saying that it's just some lacerations. It required suturing, which the defendant concedes in their reply brief. The head injury is not some bruise. It is his head is split open and requires stitches to pull it back together again. And if the court looks at the photographs from the hospital, which are really difficult to look at, some of the worst that I've had to look at in my career, you will see the blood that is dried and coated all over this little boy's head. So there is no doubt that something was, with a significant degree of force, was used on this little boy's head. And JM said it was a pipe. And it's not a PVC pipe, because there's no way a PVC pipe is going to split a little boy's head open so that he needs sutures. Wasn't the, why wasn't the weapon uncovered during the investigation? I don't think they found it during the search, Your Honor. It just wasn't. I mean, the record, it's not an exhibit. There are some photos from the search warrant, and it doesn't look like there's the weapon in there. Maybe because defendant hit it. Maybe threw it away. But not only is the case law replete with taking a blunt, a bat, a pipe, whatever, to an adult's head, this is a six-year-old boy. Like, what other intention do you have, this tiny six-year-old boy with his tiny little head, and you take a pipe and you bash it, which is JM's word, not mine, you bash it on his head, what else could you possibly be intending? But then, and they also downplayed the injuries, this little boy reported to the hospital with traumatic rhombomyelosis, which I'm sure I've butchered, but that is the condition where all of his injuries are so severe that they're releasing so much toxins into his body that his kidneys are shutting down because it cannot filter, and that head injury contributed to that. But, you know, we see cases all the time, though, where, you know, there's a fight or a beating, and the intent wasn't necessarily to kill, but in the heat of the moment, you know, you get a second degree or recklessness, right? Yep. So I'm out of time, may I answer the question? All right. That's when the other evidence comes in that also speaks to this intent, and think of it this way, think of a fight with a knife, a knife fight, right? Maybe somebody stabs somebody with a knife, and if they didn't mean to kill them, maybe they call 911 right away, but if they stab them in the stomach with a knife and then walk away, that speaks to, that's additional evidence of their intent, of their specific intent to kill, and in this case, Mr. Collins left that little boy in his room, didn't seek medical attention, hid him back there so that other members of the house couldn't see him either, and that's just like walking away in the knife fight, leaving somebody bleeding on the ground. That type of evidence can speak to his specific intent that that little boy die from his injuries. All right, thank you, counsel. Ms. Trump, if you'd like two minutes for rebuttal, you may have it. I just want to clarify a couple of factual points. Talking about RM's testimony, that he saw Mr. Collins bash in JM's head, that is not what the testimony reflects. In summarizing what RM told her, Dr. Conway said he talked about bashing JM's head in and leaving a hole. At trial, RM testified that his dad made the hole in JM's head, but when asked what caused it, he said he did not know. The reasonable inference from that is that the hole was the superficial cuts, and yes, they did need suturing, but it was to the skin, not the skull, not the brain. He didn't, there's no medical evidence that the skull was bashed in the way that one would think. This is a four-year-old's description of what a bloody wound looks like, and I understand it was bloody, and it is hard to look at. What about the forensic evidence of what the child looked like, and any medical reports on the condition of his head? What about that? The medical report, the doctor's testimony was, what I would have done to treat this immediately would have been to wash it, make sure it didn't get infected, and to suture it, which is what it required. It was, again, to the skin, not the skull. I just want to say, sorry. Do the photographs suggest that he was a bloody mess? Yes, and he said that the reason that he was a bloody mess was because he was kicked across nails, exposed in the floor. That is what JM said caused the bloody mess. RM never said he saw it, and the only person who said that he was hit in the head with a pipe was JM, who said he was knocked in the head with it. The issue is sufficiency, and our standard on sufficiency is that we view the evidence and the light most favorable to uphold the verdict, and aren't there reasonable inferences here that are counter to the position you're taking? I don't think these are reasonable inferences. I think this is bald speculation, and it has to be, the evidence has to be sufficient to find beyond a reasonable doubt. Wait a minute. Just because one person said that the hole was caused by the nails after he was hit with a pipe, and RM's statements and or testimony suggest maybe different. Don't you draw the inferences in favor of the verdict, and that is that it was caused by the beating, not a post-beating as he's falling and he scrapes his head on the nail? Sure. I think even conceding that this court can infer that the injury was caused by a pipe, again, it's superficial, not life-threatening, and I don't think it indicates lethal intent. That's our position. But what do you think about the idea that he didn't try to treat him, and he didn't call for help? I think that is the best way to read that, is that he didn't want to get caught. He didn't understand the significance of these injuries. I think that was also pretty clear, but I don't think it's an intent that, it reflects an intent that JM die. Aren't there two inferences you can draw from that? One, that he didn't want to be caught, or that it reflects his intent before, as he's beating the kid? I don't think so, because if you, even if we think it could reflect his intent as he was beating the kid, he's not going to die from these head injuries. I understand they're bloody, but the head injuries wouldn't have caused him to die, and so it wouldn't be reasonable to think, oh, well, I'm going to leave him, and this head injury is going to ultimately kill him. That would just be wrong. I've used enough time. Thank you. Thank you, counsel. We appreciate the arguments. We like an aggressive argument. Counsel are excused, and the case is submitted.